Sanders, Janet L., J.
Plaintiffs are investors in Inofin, Inc. (Inofin), a motor vehicle finance company now in bankruptcy. By this lawsuit, they seek to recoup their investment losses from Inofin’s accountants and its lawyers. The lawyers, defendants Holland & Knight, LLP (H&K) and H&K partner Richard J. Hindlian (Hindlian) now move to dismiss Count VII and VIII of the Second Amended Complaint (the “Complaint”) pursuant to Rule 12(b)(6), Mass.R.Civ.P. For reasons set forth below, this Court concludes that the defendants’ motion must be Allowed.
BACKGROUND
The allegations of the Complaint (most of which relate to acts and omissions of Inofin and the accountant defendants) can be summarized as follows. From 1994 until its bankruptcy in 2011, Inofin underwrote the lending activities of used car dealerships. It did this by purchasing retail installment sales contracts whereby the dealerships made subprime loans to high risk customers. The customers would then repay Inofin directly. To operate this financing business in Massachusetts, Inofin was required to be licensed by the Division of Banks (the Division) and to certify to the Division on an annual basis that it maintained a positive net worth of $20,000. It also had to renew its license annually and submit in connection therewith audited financial statements compliant with Generally Accepted Accounting Principles (GAAP).
To fund its operations, Inofin obtained loans from secured and unsecured lenders to whom it issued promissory notes. These lenders included the plaintiffs, whose loans were secured by an assignment of the retail installment sales contracts. Inofin assured the plaintiffs that the money they loaned to it would be used only for Inofin’s core business of extending loans to finance used car purchases. This was not true.
In late 2003 and during 2004, Inofin and its controlling shareholders, Michael Cuomo and Kevin Mann, began using investor money for other purposes — specifically for the purchase and operation of used car dealerships — that carried much higher risks. Corporations were set up to own and run these dealerships. These corporations — which the Complaint calls the “Drive Entities” and the “Prime Entities" — received loans from Inofin, even though they regularly operated at a loss. As those losses mounted, it became clear that, if the financial statements of these entities were consolidated with those of Inofin, it would not be able to satisfy the Division’s requirement that it maintain a positive net worth.
To avoid carrying these losses on Inofin’s books, Cuomo and Mann in 2005 arranged a sham sale of the Drive Entities to an Inofin employee. There is no allegation that H&K or Hindlian played any part in this, much less that they had any connection to Inofin at this point. The sale, however, was not enough to overcome the so-called “Enron rule” that essentially required that the Drive Entities’ losses be considered together with Inofin’s performance on any GAAP-compliant financial statements. To avoid this, Inofin filed unconsolidated financial statements with the Division between 2005 and 2008. As its business continued to deteriorate, Inofin also began secretly selling off large portions of its consumer loan portfolio at a discount to Mid Atlantic Financial (“MAF”). None of this was known to the plaintiffs. This series of nondisclosures constitutes the underlying fraud that the defendants are accused of aiding and abetting.
H&K’s and Hindlian’s alleged role in this fraud is first taken up 31 pages into the Complaint and rests on allegations which fall into roughly three categories:
1. The Financial Statements
In August 2006, Inofin’s Cuomo retained H&K and Hindlian to provide advice as to how it might maintain its license with the Division, explaining that Cuomo had received “inconsistent advice” from Inofin’s accountants (the other named defendants in this case) as to whether it had to include the Drive Entities in its financial statements. Hindlian did some research and by letter dated August 21,2006, told Cuomo (correctly) that the Division would likely require consolidated statements and as a consequence of the Enron rule, would not look at Inofin separately from the Drive Entities. Disregarding this advice, Inofin nevertheless filed unconsolidated statements, which were rejected by the Division as noncompliant with GAAP. If Inofin had followed Hindlian’s advice and filed GAAP-compliant financial statements, these statements would have shown that Inofin was insolvent and it would have been shut down. Instead, Inofin continued to operate, with H&K continuing to represent them in a variety of other legal matters.
2. The Private Placement Memorandum
In 2008, Inofin was desperate to raise cash and decided to sell additional promissoiy notes to investors. Hindlian properly advised Inofin that to do so, it would have to be in the form of a private placement, with appropriate disclosures to investors; otherwise, the sales would be considered sales of securities and require registration under federal securities law. Hindlian began drafting a Private Placement Memorandum (PPM) but was then informed by Cuomo he intended to raise the money from “friends and family” instead. Hindlian “knew or should have known that Cuomo’s assertion that Inofin’s investors were all friends and family was plainly untrue.” 117. Hindlian *59 stopped work on the PPM, and (the Complaint alleges) thereby “acquiesced and allowed Inofin to continue with its Ponzi scheme.” 118.
3. The SEC investigation
In 2009, the SEC began an investigation into Inofin and that September, issued a subpoena. H&K represented Inofin in that investigation and aggressively advocated on its behalf. The law firm also urged the SEC not to contact investors (fearing they might make a “ran on the bank”) and took no steps to encourage Inofin on its own to disclose to investors the SEC investigation. Through this legal representation, H&K thus “helped prop up Inofin in business and perpetuated Inofin’s cover-up of its true financial condition long past the time it should have failed and the plaintiffs could have recovered their investments.” 126.
DISCUSSION
Count VII alleges that H&K and Hindlian aided and abetted Inofin in committing fraud against the plaintiffs. Count VIII alleges a violation of G.L.c 93A relying on the same allegations. To withstand a motion to dismiss under Rule 12(b)(6), the complaint must contain “allegations plausibly suggesting (not merely consistent with) an entitlement to relief...” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007). Although a complaint need not set forth detailed factual allegations, a plaintiff is required to present more than labels and conclusions and must raise a right to relief “above the speculative level.” Id. Moreover, actions for aiding and abetting fraud are subject to the heightened pleading standard of Rule 9(b), Mass.R.Civ.P. This Court concludes that the factual allegations are insufficient to support either Count VII or Count VIII.
The parties agree as to what the plaintiffs must allege to make out a claim of aiding and abetting fraud. “For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other’s conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.” Restatement of Torts §876(b). In the instant case, that would require proof not only that Inofin had committed a fraud upon the plaintiffs but that H&K and Hindlian knew of the fraud and “actively participated in or substantially assisted!’ in its commission. Go-Best Assets Ltd. v. Citizens Bank of Mass., 463 Mass. 50, 64 (2012). Even assuming that the Complaint contains enough to show the defendants actually knew Inofin was defrauding the plaintiffs (itself a questionable assumption), this Court concludes that the Complaint falls well short of alleging facts showing that H&K and Hindlian provided substantial assistance to Inofin in the commission of any fraud.
As to Inofin’s financial statements, H&K and Hindiian correctly advised Inofin that it had to file consolidated statements that would reflect the Drive Entities losses; indeed, the defendants repeated this advice in 2009 by informing Cuomo that the Enron rule had only been strengthened. That Inofin chose to ignore that advice and that the defendants did nothing to stop it (or “acquiesced,” as the Complaint alleges) cannot support an inference that they thereby participated or assisted in that conduct. Silence or inaction in the face of a client’s tortious conduct does not mean that the lawyer can be held liable for that conduct in the absence of any separate duty owed to the plaintiffs. Austin v. Bradley Barry & Tarlow, P.C., 836 F.Sup. 36, 38-40 (D.Mass. 1993) (attorneys were not liable to investors for failing to disclose what they knew about client’s solvency since they owed no duty to investors); see also Schwan’s Sales Enterprises, Inc. v. Commerce Bank & Trust Co., 397 F.Sup.2d 189, 199 (D.Mass. 2005). Nor can an attorney be said to aid and abet a wrongdoer client simply because the lawyer continues to represent the client on other matters. “[Substantial assistance means something more than merely providing routine professional services that aid the tortfeasor in remaining in business, but do not proximately cause the plaintiffs’ harm.” El Camino Resources, Ltd. v. Huntingon Nat’l Bank, 722 F.Sup.2d 875, 911 (W.D.Mich. 2010).
As to the private placement memorandum, the defendants again correctly advised Inofin about its obligations under federal securities law in connection with its plan to sell promissory notes. That Hindlian, at Inofin’s request, stopped performing the work necessary to fulfill those obligations does not provide a legal basis to hold him liable. As the defendants point out, H&K did not control Inofin or its officers; indeed, the Complaint alleges the opposite — namely, that Inofin ignored H&K’s legal advice. Certainly, this Court is aware of no precedent for the proposition that an attorney has to take affirmative steps to ensure that a client follows his advice in order to avoid being held liable for the consequences of his client’s conduct. As to the allegation that H&K simply accepted without question Cuomo’s claim that the sales would be made only the “friends and family,” this Court is not aware of any duty imposed on a lawyer which would require that he independently verify that what his client tells him is indeed the truth.
The allegations relating to the defendant’s representation of Inofin in the SEC investigation fare no better. The plaintiffs argue first that the defendants did not disclose the existence of this investigation to Inofin investors, but they owed no duty of disclosure to the plaintiffs. See In re Cascade Int’l Sec. Lit., 840 F.Sup. 1558, 1564 (S.D.Fla. 1993) (attorney has no duty to disclose potentially negative information about a client to a third party in the absence of some fiduciary relationship with the third party). Indeed, the *60 defendants had an obligation at that point to protect the interests of Inofin in the context of an adversary proceeding. Second, the plaintiffs contend that the representation itself assisted Inofin to continue to commit fraud: by requiring the SEC to deal with their legal arguments, H&K were able to “buy time" for Inofin before it finally went under. But a lawyer may (and indeed often does) advocate on behalf of a client accused of wrongdoing without thereby implicating himself in the wrongdoing.
More generally, the plaintiffs maintain that inaction or silence may constitute substantial assistance where the defendant manifests a “conscious intent” to further the principal violation. Massachusetts does not appear to have adopted “conscious intent” as a substitute for active participation, however. As to those federal cases which have so held, the courts have made it clear that conscious intent is something more than mere knowledge but requires a showing that the “defendant has thrown in his lot with the primary violators.” DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1986), quoting Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir. 1986). “Crucial to this determination is ‘whether the alleged aider-and-abettor benefitted from such silence.’ ” Austin v. Bradley, Barry & Tarlow, 836 F.Sup. 36, 40 (D.Mass. 1993), quoting First Interstate Bank v. Pring, 969 F.2d 891, 899 (19th Cir. 1992). Receiving a fee for legal services is not enough, since that kind of economic motivation is too minimal to demonstrate that the defendant’s silence was “designed intentionally to aid the primary fraud.” See e.g. Austin v. Bradley, Barr & Tarlow, 836 F.Sup. at 40; quoting National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 207 (2d Cir. 1989). In the instant case, the Complaint falls far short of alleging that H&K and Hindlian had essentially thrown in their lots with Inofin or benefited from any fraud upon the plaintiffs.
Count VIII alleging a 93A violation requires little discussion. It rests on precisely the same allegations that Count VII relies on. If those allegations do not support an aiding and abetting claim, then they cannot support a claim under 93A either. See e.g. Macoviak v. Chase Home Mortgage Corp., 40 Mass.App.Ct. 755, 760 (1996).
CONCLUSION AND ORDER
For all the foregoing reasons, the defendants’ Motion to Dismiss is ALLOWED and it is hereby ORDERED that Counts VII and VIII be DISMISSED.